UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AUSTRIAN AIRLINES OESTERREICHISCHE
LUFTVERKEHRS AG,

                    Plaintiff,

          -against-                                    04 Civ. 3854 (LAK)


UT FINANCE CORPORATION,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


                         OPINION

          Appearances:

                         William E. Wallace III
                         Donna Frances Mulvihill
                         Aaron L. Renenger
                         Andrew M. Leblanc
                         Andrew E. Tomback
                         Lesley A. Benn
                         MILBANK, TWEED, HADLEY & MCCLOY LLP
                         *Attorneys for Plaintiff*


                         John M. Toriello
                         Marc L. Antonecchia
                         HOLLAND & KNIGHT LLP
                         *Attorneys for Defendant*


LEWIS A. KAPLAN, *District Judge.*

          During the 1990's, United Technologies Corporation ("UTC") was anxious to have

Austrian Airlines specify jet engines made by one of UTC's affiliates for use on new aircraft being

ordered by Austrian.  It entered into a somewhat complex deal pursuant to which Austrian agreed

to do so, and a UTC affiliate, UT Finance Corporation ("UTF"), probably as a "sweetener," agreed to buy a particular used aircraft from Austrian some years in the future for a price in excess of $30 million. But buying a jet aircraft for future delivery for more than $30 million is considerably more complicated than buying a used car for immediate delivery for quite a bit less money. The purchase agreement understandably made UTF's obligation to consummate the purchase contingent on satisfaction of a myriad of conditions.

At least in part as a result of the 2001 terrorist attacks on the World Trade Center and the Pentagon, the bottom fell out of the used aircraft market between the time the purchase agreement was signed and the approach of the date for delivery of the used aircraft. UTF allegedly was anxious to avoid buying an aircraft for far in excess of its market value and, in any event, insisted on strict compliance with the contractual requirements. Austrian failed in major respects to satisfy the conditions precedent to UTF's obligation to purchase, and UTF rejected delivery. Austrian then brought this action for breach of contract, claiming primarily that UTF's alleged desire to avoid what had become a disadvantageous deal led it to reject the aircraft in bad faith.

The case was tried to the Court without a jury. UTF moved for judgment of dismissal on partial findings at the close of plaintiff's case. The Court now grants the motion and makes the following findings and conclusions.

*Facts*

I.     *The Parties*

Austrian Airlines Oesterreichische Luftverkehrs AG ("Austrian") is a corporation organized under the laws of Austria with its principal place of business in Vienna. UT Finance

Corporation ("UTF") is a Delaware corporation with its principal place of business in Connecticut and is a finance arm of UTC that, among other things, acquires used passenger and cargo aircraft, which it typically then leases or sells to other operators.

## II.        *The Underlying Relationship*

The contract at issue in this case arose from an underlying agreement, dated December 23, 1996, between Pratt & Whitney, which is an affiliate of UTC and a major manufacturer of jet engines, and Austrian.  Austrian there (1) agreed to place a firm order with Airbus Industrie ("Airbus") for a minimum of two and up to four of Airbus's model A330-200 aircraft, each to be powered by Pratt & Whitney's model PW4168 Propulsion System, (2) took an option to purchase up to four additional A330-200 aircraft from Airbus and agreed, to the extent it exercised that option, to ensure that each was powered by the PW4168 Propulsion System, and (3) took an option to purchase up to two additional PW4168 spare engines for use on its A330-200 aircraft.[1]  The price for each PW4168 system was approximately $10 million.[2]  The deal therefore was worth between approximately $20 and $100 million to Pratt & Whitney.

## III.       *The Aircraft Purchase Agreement*

To induce Austrian to enter into the contract with Pratt & Whitney, a second contract – the Aircraft Purchase Agreement ("APA") – was formed.  UTF there agreed to purchase from

---

[1]

PX 14 § R; *id.* Attachment I; Tr. (Wallace) at 7:11-16.

[2]

Docket item 140 ("Pl. Trial Br.") at 1.  Austrian ultimately purchased nine propulsion systems for approximately $88 million.  Tr. (Wallace) at 13:15-16.

Austrian the used Airbus A310 aircraft at issue here for $32 million.[3]  The parties agreed further that

> "[t]o the extent that the Aircraft is delivered in accordance with the delivery conditions required by [the APA] and to [UTF's] satisfaction, [UTF] shall make [$1 million] cash credit available to [Austrian] on the Closing Date.  To the extent of any non-compliance with the delivery conditions on the Closing Date, [UTF] may accept the Aircraft, in which event [UTF] shall subtract the value of any such non-compliance (to be determined as the amount reasonably required by [UTF] to satisfy the delivery conditions) from such credit; provided, however, that [UTF] shall not be responsible for the value of any such non-compliance in excess of ONE MILLION U.S. DOLLARS.  *For the avoidance of doubt, [Austrian] hereby confirms and agrees that it is obligated to deliver the Aircraft to [UTF] on the Closing Date in accordance with all of the delivery conditions contained in [the APA] and that [UTF] has no obligation to purchase the Aircraft in the event such delivery conditions are not met.*"[4]

This provision was unique to this contract.  The price adjustment term was included to resolve difficulty in the parties' agreeing on a purchase price.[5]

    The APA provided that the "purchase of the Aircraft by [UTF] shall occur on a date to be mutually agreed during the month of March, 2004"[6] and made time of the essence.[7]  Moreover,

---

[3]

   PX 23 § 2.2.

[4]

   *Id.* § 2.2A (emphasis added).  The last sentence of this provision, as it appears in the APA, contains a typo.  It states: "For the avoidance of doubt, [Austrian] hereby confirms and agrees that it is obligated to deliver the Aircraft to [UTF] on the Closing Date in accordance with all of the delivery conditions contained in [the APA] and that [***Austrian***] has no obligation to purchase the Aircraft in the event such delivery conditions are not met."  The parties do not dispute that the bold italicized ***Austrian*** should be "UTF."

[5]

   Austrian wanted $33 million for the Aircraft but UTF did not want to pay more than $32 million.  Section 2.2A provided Austrian the opportunity to receive its desired price if it satisfactorily complied with every condition. Tr. (Komposch) at 79:14-82:2.

[6]

   PX 23 § 2.1.

[7]

   *Id.* § 11.8.

any amendments and modifications to the agreement had to be in writing and signed by both parties.[8]

UTF's obligation to purchase the Aircraft was contingent upon Austrian satisfying conditions set forth in Exhibits C and D of the APA.[9] Exhibit C required Austrian to provide UTF certain records, including in relevant part (1) the "FAA/DGAC-Approved Airplane Flight Manual" (the "AFM"), which had to be "current and include all temporary revisions,"[10] and (2) miscellaneous documentation, including historical records for certain "life-limited" parts.[11]

Exhibit D specified the delivery conditions for the Aircraft itself. Austrian was obligated to deliver the Aircraft (1) "in good operating condition, ready for flight, with all the equipment, components and systems functioning in accordance with their intended use within the limits and/or unrestricted guidelines established by the relevant manufacturers,"[12] (2) with a letter from Airbus "to confirm the Aircraft met the US-Type Certificate Data Sheet (TCDS) at the date of manufacture,"[13] (3) in a condition that complied with all DGAC and FAA airworthiness directives that "have a known due date for compliance falling within twelve . . . months following the Closing

---

[8]
 *Id.* § 11.9.

[9]
 *Id.* §§ 2.1, 3.2.5.

[10]
 *Id.* Ex. C § A. UTF was obligated to notify Austrian at least one year prior to delivery if an FAA-Approved AFM was not required.

[11]
 *Id.* Ex. C § E.

[12]
 *Id.* Ex. D § (1)(ii).

[13]
 *Id.*

Date,"[14] (4) in the condition as it was when the parties entered into their agreement,[15] (5) with at least a minimum amount of time left on all life-limited parts,[16] and (6) with an export certificate of airworthiness from the Austrian aviation authority.[17]

One of the principal areas of contention in this case arises out of Section (1)(iii) of Exhibit D, which required that the Aircraft

> "shall be in the condition required to be 1) fully eligible to receive a DGAC or FAA (at Buyer's choice) Certificate of Airworthiness and 2) fully eligible to be promptly registered and operated as a FAR Part 119 or 121 (and DGAC equivalent) 180 minute ETOPS for scheduled airlines, under the laws, rules and regulations of the DGAC or FAA (at Buyer's choice)."[18]

## IV.     *Regulatory Framework Governing the Aircraft*

UTF exercised its option under Section (1)(iii) of Exhibit D in September 2002, informing Austrian that the Aircraft would have to comply with FAA standards.[19]  This imposed obligations on Austrian, among other things, to deliver the Aircraft in the condition required to be eligible (1) for an FAA certificate of airworthiness and (2) to be promptly registered and operated under Federal Aviation Regulation part 119 or 121.

---

[14]     *Id.* § (1)(iv).

[15]     *Id.* § (1)(viii).

[16]     *Id.* § (1)(ix).

[17]     *Id.* § (1)(xii).

[18]     *Id.* § (1)(iii).

[19]     PX 26.

A.      *FAA Certificate of Airworthiness*

The process by which an aircraft manufactured and registered in the United States is certified as airworthy begins with the approval of the aircraft model's design. If an applicant is able to demonstrate that the design meets rigorous safety standards, the FAA will issue a type certificate ("TC") for that model documenting the design and incorporating a type certificate data sheet ("TCDS"), which "prescribes conditions and limitations under which the product for which the Type Certificate was issued meets the airworthiness requirements of the Federal Aviation Regulations."[20] Any individual aircraft of that model thereafter may be eligible for a certificate of airworthiness if the applicant can demonstrate that the aircraft conforms to the FAA-approved design documented in the TC and is in a condition for safe operation.[21]

An aircraft manufactured in a foreign country may be eligible to receive a certificate of airworthiness from the FAA, but the process is different.[22] As an initial matter, the aircraft must be manufactured in accordance with an FAA-approved TC, which can be issued only if (1) the United States has a bilateral agreement for the acceptance of aircraft for import and export with the country of manufacture, and (2) the country of manufacture certifies that the aircraft has been determined to meet, *inter alia*, "[t]he applicable airworthiness requirements of [14 C.F.R. § 21.17], or the applicable airworthiness requirements of the country in which the product was manufactured and any other requirements the [FAA] may prescribe to provide a level of safety equivalent to that

---

[20]      PX 25, at AUA19269.

[21]      *See* Tr. (Whelan) at 128:19-24; Tr. (Aupperlee) at 157:12-21.

[22]      DX BE, at 3.

provided" by the Federal Aviation Regulations.[23] The foreign aviation authority must certify that the aircraft in question conforms to the approved design and is in a condition for safe operation.[24] The FAA may rely on that certification but may conduct additional inspections to determine whether the aircraft meets U.S. safety standards.

The FAA had issued a TC for the Airbus model A310-325 on March 22, 1996, in accordance with the bilateral agreement between the United States and France.[25] Accordingly, from that point onward, any given A310-325 would have been eligible for an FAA certificate of airworthiness *provided* the particular aircraft conformed in all material respects with the TC and any other applicable requirements.

B.    *Federal Aviation Regulation Part 119 or 121 180 Minute ETOPS*

Federal Aviation Regulation ("FAR") part 119 governs the certification of air carriers or commercial operators engaged in air commerce, and part 121 governs the operations engaged in by those certified under part 119.[26] Part 121 governs also extended range operations ("ETOPS")

---

[23]

14 C.F.R. § 21.29. Bilateral agreements "are cooperative agreements between the U.S. and the government of a foreign country for their mutual benefit. . . . [They] are based on a high degree of mutual confidence in the technical competence and regulatory capability of the aviation authority of the exporting country for performing aircraft certification functions within the scope of the agreement." *See* DX AQ, at § 1-4.a (plaintiff's objection to this exhibit on the grounds of authenticity and lack of foundation is overruled).

[24]

*See, e.g.*, PX 25, at AUA19269.

[25]

At all relevant times, the applicable version of the TCDS was A35EU revision 17. *See id.* at AUA19321; *see also* DX AJ, at UT 002376.

[26]

*See* 14 C.F.R. §§ 119, 121.

flights, which are defined as flights that are conducted "over a route that contains a point farther than one hour flying time at the normal one-engine inoperative cruise speed . . . from an adequate airport."[27]

The FAA approval process for ETOPS flights is extensive and generally involves two stages.[28] The first is a determination that the airframe and engines for a specific aircraft model are sufficiently reliable to engage in safe extended flights.[29] During this stage, the FAA develops a standard for configuration, maintenance, and procedures ("CMP") of the aircraft, which defines the minimum requirements necessary to establish the suitability of an airframe-engine combination to engage in ETOPS flights.[30] If the FAA approves an airframe-engine combination for ETOPS flights, such approval "is normally reflected by a statement in the FAA-approved [AFM] and Type Certificate Data sheet or Supplemental Type Certificate . . . , which specifies the CMP standard requirements for suitability."[31] The second stage involves a determination whether the operator that will conduct ETOPS flights has the ability to maintain and operate the aircraft in a safe manner during those flights.[32] This latter approval is granted only to United States operators.

---

[27]    PX 2, at 1. The APA contemplated that the Aircraft be in a condition to be registered to engage in ETOPS flights over a route containing a point 180 minutes from an adequate airport.

[28]    *See generally id.*

[29]    *See id.* § 7(f)(1).

[30]    *Id.* § 4(c).

[31]    *Id.* § 7(f)(1).

[32]    *Id.* § 7(f)(3).

V.      *The Events Preceding March 2004*

    A.      *UTF and Austrian Jointly Inspect the Aircraft*

        In early 2003, UTF hired Patrick Sturbelle, an FAA-certified designated airworthiness representative ("DAR"),[33] to begin working to ensure that the Aircraft and its associated records met the APA's delivery conditions.  He and Wolfgang Fieglmüller, Austrian's project manager for the transaction, conducted a visual inspection of the Aircraft on April 22, 2003, at Lemwerder Aerodrome in Germany, at which time Fieglmüller concluded that the Aircraft was in poor condition with "large parts of the cabin [needing] to be refurbished."[34]

        UTF subsequently hired Raimund Philipp of Philipp Aviation Consulting & Engineering GmbH ("PACE") as a technical consultant to assist with the delivery of the Aircraft.[35] He, Sturbelle, and Helmut Bachhofner, another PACE employee, conducted a second visual inspection of the Aircraft on July 28, 2003, principally to determine the manner in which it was being stored and maintained.  UTF and Austrian met the next day to discuss the more than 150

---

[33]

    The FAA has the authority to designate qualified persons to represent it in the examination and inspection of aircraft for the purpose of issuing aircraft certificates.  *See* 14 C.F.R. § 183.1.  A DAR is designated by the FAA to "[p]erform examination, inspection, and testing services necessary to issue, and to determine the continuing effectiveness of, certificates, including issuing certificates, as authorized by the Director of Flight Standards Service in the area of maintenance or as authorized by the Director of Aircraft Certification Service in the areas of manufacturing and engineering." *Id.* § 183.33(a).

[34]

    DX NK (Fieglmüller Dep.) at 58:22-59:5.

[35]

    *See* PX 29, at PACE 011242.

deficiencies that needed correction to bring the Aircraft into compliance with the APA.[36]
Fieglmüller's minutes of the meeting noted that Austrian's "situation [was] even more precarious
. . . than [he] had originally assumed."[37]

> B.  *Austrian Investigates the Approval Status of the Auxiliary Center Tanks*

One of the discussion items at the July 29 meeting concerned the need for Austrian
to contact the FAA regarding the Aircraft's two auxiliary center fuel tanks ("ACTs") because they
were not part of the FAA-approved design of the A310-325. Both parties were concerned that this
design deviation would affect the Aircraft's ability to obtain a certificate of airworthiness.

Airbus contacted the FAA on Austrian's behalf on August 1, 2003, and the FAA
confirmed that the ACTs were not listed in the TCDS and therefore were not part of the approved
design type. While the FAA recognized that it theoretically might have approved the tanks by an
alternative method, neither it nor Airbus was able to locate any documentation to demonstrate that
the FAA actually had done so.[38]

---

[36]
　　　*See* DX EW.

[37]
　　　*Id.* at AUA14833 (English translation). The German version of the relevant portion of DX
EW reads "Unsere [s]ituation ist noch besch....eidener als ich es ursprünglich angenommen
habe." Although the English translation provided by the parties uses the word "precarious"
to describe Austrian's situation, "besch....eidener" appears to be a play on words, the
meaning of which perhaps is more faithfully translated as "crappy" or "shitty."

[38]
　　　PX 30; PX 46.

C.    *The Parties Assess Austrian's Obligations*

Manfred Komposch, the director of Austrian's aircraft asset management department and the person who negotiated the APA on behalf of Austrian, received an internal report on September 22, 2003, indicating that the APA was "subject to being serviced in accordance with the approval guidelines of the US FAA.  This means that the aircraft must conform to the FAR 121 guidelines."[39]  The report concluded that there were "going to be a few places where the [A]ircraft [did] not clearly conform to the contract."[40]  Austrian then met with UTF, which indicated that it was expecting (1) the Aircraft to be "immediately approvable [*sic*] under FAR121" and (2) "FAA ETOPS approval."[41]  Austrian noted only that compliance with the FAR part 121 requirement would be "difficult" but otherwise concluded that "[e]verything must be considered from the viewpoint of the FAA."[42]

UTF began its in-depth inspection of the Aircraft and its records in November 2003 and immediately notified Austrian that the Aircraft failed to meet the delivery conditions in a myriad of respects.  In particular, UTF was concerned with the approval status of (1) the ACTs and (2) the Aircraft for use in 180-minute ETOPS flights.[43]  Austrian recognized internally that, "[a]ccording

---

[39]

DX AW, at AUA09381 (English translation).

[40]

*Id.* at AUA09382 (English translation).  Komposch did not object to this analysis.  *See* DX FK; Tr. (Komposch) at 41:9-21.

[41]

DX FM.

[42]

*Id.*

[43]

*See* DX FT, at UT 002032.

to the current status of things, the contractually stipulated FAA 180 min ETOPS limit according to the FAA cannot be achieved"[44] and informed UTF that the Aircraft would comply only with the 180-minute ETOPS requirements that existed in Europe.[45]

Richard Ferris, who negotiated the APA on behalf of UTF, made plain that he "expect[ed] the technical approval for ETOPS operation, per FAA regulations, to be granted for th[e] aircraft in the configuration" in which it was delivered and recommended that Austrian, either by itself or with Airbus, consider the possibility of approaching the FAA for such approval.[46] Austrian, however, did not have enough time to get the requisite approval due to the approaching delivery deadline.[47] Moreover, Komposch was concerned that the ETOPS issue was only one of many deficiencies and hoped that the "great many things" of which Austrian was "just becoming aware . . . [could] be cleared up in time" for March 2004.[48]

Austrian finally began to address the delivery conditions in January 2004 when Steven Whelan, a consultant working on behalf of Austrian,[49] contacted the FAA to inquire about

---

[44]

DX FN, at AUA41754 (English translation).

[45]

DX JK, at UT000095. Austrian could not comply with the FAA ETOPS standards for the model A310-325 because no such standards existed. *See* PX 39.

[46]

DX JK, at UT000095.

[47]

*See* PX 42, at AUA15238 (English translation).

[48]

*Id.* Komposch noted, for example, that the back-to-birth traceability of limited life parts and the installation of the enhanced ground proximity warning system would be two issues that could be "critical" in the delivery of the Aircraft. *Id.*

[49]

Whelan was an FAA-certified DAR, although he was not hired in that capacity by Austrian. *See* Tr. (Whelan) at 127:11-22.

the available means for obtaining ETOPS approval because "the aircraft [had to] be part 121 compliant and be eligible for 180 min. ETOPS at the time of delivery" but "no provision for ETOPS for this series A310" existed.[50] The FAA responded that (1) its Advisory Circular 120-42A outlined "the acceptable means for obtaining ETOPS approval," (2) "it [was] possible for the type design portion of the evaluation to be done separately from the operational portion," and (3) this could be done by Airbus on behalf of Austrian.[51]

Austrian then requested that Airbus seek FAA approval of the ACTs and the A310-325 for use in ETOPS flights.[52] Airbus responded that the ACTs already had been approved on behalf of the FAA by the DGAC.[53] In any case, Airbus did not apply for ETOPS approval because the FAA informed it that resource constraints prevented it from considering such an application unless Airbus identified a United States operator who would conduct the flights after approval.[54]

D.    *UTF Weighs its Options*

The parties met on February 18, 2004, at which time UTF informed Austrian that it

---

[50]    PX 43, at AUA25445.

[51]    *Id.*; *see also* PX 45.

[52]    Austrian's formal request to Airbus evidences that Austrian was "obliged according to [its] contract with UT Finance . . . to deliver [the Aircraft] . . . with the approval for 180 min. ETOPS Diversion Time." DX N, at AUA23580. Moreover, Austrian admitted with respect to the ACTs that "[a]t the delivery to UT Finance, the [Aircraft] has to be in full compliance with FAA regulations." DX KB, at AUA19508.

[53]    PX 62, at AB(AUAvUTF)-000812.

[54]    *See* PX 47, at AUA19471; PX 51.

would (1) assist Austrian and "represent its position as a future owner" in the ETOPS approval process and (2) "accept an FAA letter stating the FAA TCDS update was not required" in order to establish approval of the ACTs.[55]   Five days later, Klaus Stoeger, Austrian's executive vice president, inquired of the UTF inspection team in Lemwerder whether UTF would be willing to negotiate a reduction in price of the Aircraft in exchange for contractual shortfalls.[56] UTF then began to discuss internally whether it should refrain from negotiating any concessions on the delivery conditions until after the March delivery deadline had passed so as to capitalize on the "opportunity to restructure the agreement to reflect the current market conditions and to adjust some of the delivery conditions to be acceptable to both parties."[57]

Thus, it appears that both sides understood by February that Austrian would not deliver in conformity with the APA and were considering the possibility that UTF would waive some of the conditions in exchange for financial concessions by Austrian.   As will appear, no such agreement ever was reached.

VI.    *March 2004*

A.    *Austrian Unilaterally Sets a March 25 Delivery Date*

On March 10, 2004, Komposch sent a fax to Ferris in which he stated that Austrian

---

[55]     PX 53, at PS000990-91 (emphasis omitted).

[56]     *See* PX 56, at UT 004279.

[57]     *See id.* at UT 004277.

would deliver the Aircraft on March 25.[58]  Ferris rejected that date, in large part because the APA

provided UTF with a 15-day period prior to delivery during which it could inspect the Aircraft and

its records.  That 15-day period, however, could not begin until all work was completed on the

Aircraft, which could not have preceded the March 19 final test flight.  Ferris recognized that this

might push delivery into April but noted that he would be willing to consider such a possibility if

the parties could "agree on financial compensation for the time delay that our inspection period

extends beyond March 31."  He concluded that "consent to this delay shall not be taken as [UTF's]

willingness to consider any further delay."[59]

Austrian asserted that UTF was not entitled to a 15-day inspection period because it

had been inspecting the Aircraft continuously since November, and it reiterated its intent to deliver

the Aircraft on March 25,[60] a proposal that UTF again rejected.[61]  Austrian responded that it (1)

believed that the Aircraft could be delivered on March 25 but (2) understood UTF would not permit

that to occur.  It therefore suggested that UTF propose an agreeable delivery date.[62]  UTF did not do

so.

---

[58]

PX 67, at UT 001228.

[59]

PX 68, at AUA18005.

[60]

PX 72, at AUA00587-88.

[61]

PX 73.

[62]

PX 76.

*B.      The Aircraft's Condition as of March 31*

There is no serious dispute that the Aircraft failed to comply with Section (1)(iii) of

Exhibit D as of March 31, 2004.[63]  Nor is there any dispute that it had other significant deficiencies.

*1.      The Airplane Flight Manual*

The Aircraft did not have a current FAA-approved airplane flight manual ("AFM")

as required by Exhibit C because it did not list the additional fuel capacity afforded by the ACTs.[64]

Although Austrian initially contended that the AFM already included reference to an ACT and

therefore did not need updating,[65] on March 20 it requested that Airbus amend the relevant pages to

include the tanks.[66]

*2.      The Passenger Cabin*

The passenger cabin failed to comply with FAA standards and therefore did not

comply with the APA.  Many seats needed new cushions and covers and those then had to be

inspected to ensure compliance with FAA regulations concerning flammability.  Fifty-three seats had

damage to their legs that exceeded the maximum allowed under the relevant maintenance

---

[63]

       *See, e.g.*, Tr. (Kotzian) at 94:6-96:12; Tr. (Whelan) at 138:13-140:7.

[64]

       *See* Tr. (Whelan) at 143:6-144:18.

[65]

       *See* PX 78, at AUA20256, AUA20261.

[66]

       PX 77, at AUA19119.  It made this request because "the FAA approved AFM must show the total fuel quantity of all tanks, including the two ACTs."  *Id.*  Airbus agreed to update the AFM but noted that all amendments needed FAA approval and therefore the prospects of resolving the issue quickly "look[ed] bleak."  PX 81.

standards.[67]  Footrests needed to be reinstalled and deactivated on certain seats.[68]  And the layout of the cabin had to be completed and approved.[69]

### 3. Records for Life-Limited Parts in the Landing Gear

Some of the documentation accompanying the Aircraft did not comply fully with the delivery conditions.  For example, although Austrian was required to provide "historical data including traceability for all life limited parts"[70] and provided it for some, it failed to do so for eleven life-limited parts in the landing gear.  Instead, Austrian provided a conservative life calculation because back-to-birth records did not exist for those parts.[71]

### 4. The Enhanced Ground Proximity Warning System

The APA required that the Aircraft "be in compliance with . . . FAA airworthiness directives and standards which, in each case, have a known due date for compliance falling within

---

[67]

*See* Tr. (Kotzian) at 96:13-99:14; Tr. (Whelan) at 139:4-140:7.

[68]

Tr. (Kotzian) at 123:14-124:7.

[69]

*Id.* (Whelan) at 138:24-139:3; *see also* Pl. Trial Br. at 24 ("[T]he [cabin layout] was approved on May 2, 2004.").

[70]

PX 23 Ex. C § E(10).  Life-limited parts are those parts that by regulation must be replaced after a certain period of time.  The documentation containing their historical data is referred to as "back-to-birth" records.

[71]

Tr. (Kotzian) at 118:10-119:24.  The records did not exist because they were not required at the time that the landing gear on the Aircraft was manufactured.

twelve (12) months following" the delivery date.[72]  Because a March 31 delivery would have occurred after March 29, 2004, Austrian was required to install an enhanced ground proximity warning system ("EGPWS") because the FAA required all turbo-powered aircraft to be so equipped by March 29, 2005.[73]  Austrian, however, had not installed the EGPWS, notwithstanding its understanding that it was required to do so.[74]

## VII.    April to May 2004

Austrian continued to work on the Aircraft notwithstanding the passing of the March 31 deadline, requesting once again that Airbus seek FAA approval of the ACTs and the revisions to the AFM.[75]  UTF, meanwhile, provided Austrian with status reports concerning its view of the progress being made on the Aircraft.[76]  Moreover, on April 20, UTF sought to retain Philipp to "represent UT Finance at . . . Lemwerder . . . and in Vienna as required to inspect the aircraft structure, structural repairs and associated records to assure the aircraft is in compliance with the

---

[72]

   *See* PX 23 Ex. D § (1)(iv).

[73]

   *See* 14 C.F.R. § 121.360.

[74]

   *See* PX 109, at AUA 51155 ("[A]s of March 29, 2005, FAR 121 will require EGPWS to be installed.  Upon the choice of an operator of the Aircraft at that time, [Austrian] shall be ready to compensate or to undertake the necessary installations. . . .").  The Court does not credit Austrian's assertions at trial that it was not required to install the EGPWS. *See, e.g.*, Tr. (Komposch) at 30:19-35:21.  That position is contradicted by Austrian's prior statements and was taken solely for purposes of this litigation.

[75]

   *See* PX 90, at AUA51166.

[76]

   *See, e.g.*, PX 97.  The UTF team inspecting the Aircraft provided these reports pursuant to instructions from Ferris.  *See* PX 92.

contract."[77]

At the end of April, Austrian, UTF, and Pratt & Whitney met in an effort to finalize the transaction. Following the meeting, Vagn Sørensen, the chief executive officer of Austrian, sent a letter to Robert Leduc at Pratt & Whitney confirming that

"as per 3 May, 2004, the [A]ircraft will comply with all agreed Delivery Conditions of the Purchase Agreement subject to [*sic*] following qualifications:

"1. All time controlled parts will be compliant at the date of delivery.

"2. As to the eligibility of the Aircraft for the 180 minutes ETOPS-operations, I can confirm that the aircraft complies with the French DGAC - CMP configuration standard in DOC AI / EA 3000 (latest revision). An equivalent CMP by FAA for 180 minute ETOPS does not exist.

"3. With respect to the ACT - certification to FAA standards, we have received a guarantee from Airbus Industries that this condition shall be complied with within four months, i.e. by 31 August, 2004 at the latest, by issuance of a DGAC-approved Service Bulletin, acceptable to the FAA. This includes the FAA-approved AFM."[78]

He noted also that the landing gear had to be overhauled and the EGPWS installed.[79]

Austrian received the requisite approvals for the passenger cabin,[80] and Whelan issued a statement on May 3 in which he asserted that the Aircraft was "eligible for U.S. airworthiness

---

[77]

PX 98, at PACE 006538.

[78]

PX 109, at AUA51155. Austrian challenged UTF's reliance on this exhibit on the ground that it is an offer of settlement and therefore is precluded from being used to prove liability under Fed. R. Evid. 408. The Court notes that two of Austrian's witnesses also relied on the same exhibit, *see* PX 213 (Komposch) ¶ 13, PX 214 (Kotzian) ¶ 10, and, in any case, Austrian submitted it at trial.

[79]

PX 109, at AUA51155.

[80]

*See* PX 106.

certification and operations under CFR Part 121" save for one relevant exception – the "Aircraft auxiliary center tank fuel system (ACT 1 and 2) [was] not yet FAA approved."[81] UTF, however, did not accept delivery of the Aircraft.

## VIII.    Post-May 3 Events

### A.    The Airplane Flight Manual

The FAA informed Airbus on May 11 that the temporary revisions to the AFM were satisfactory and could be approved by the DGAC on behalf of the FAA.[82] The DGAC granted that approval on July 19, 2004.[83]

### B.    The ACTs

Although Airbus contended that the FAA had approved the ACTs, on October 22, 2004, it applied for approval of the ACTs for use on the A310-325.[84] Pursuant to FAA regulations and the bilateral agreement between France and the United States, the DGAC confirmed that the tanks complied with the US type certification basis and the FAA issued its formal approval on

---

[81]    PX 107.

[82]    PX 110, at AB(AUAvUTF)-000530.

[83]    PX 114.

[84]    PX 115, at AB(AUAvUTF)-000433.

November 30, 2004.[85]

C.     *ETOPS Approval Status*

In August 2004, Airbus applied for FAA approval of the model A310-325 for use in 180-minute ETOPS flights.  Austrian failed to establish at trial that any such approval was granted.

D.     *Lease and Sale of the Aircraft*

Austrian leased the Aircraft to Air Atlanta Icelandic from December 2004 through February 2007.[86]  It then sold the Aircraft to SATA Air for $12.5 million in March 2007.[87]

IX.     *The Position of the Parties*

Austrian contends that it was not obliged to tender the Aircraft by March 31, 2004, because UTF waived its right to enforce timely delivery.  It argues further, notwithstanding its view that the Aircraft failed to conform strictly to the APA, that UTF then acted in bad faith when it ignored alleged industry custom and rejected Austrian's delivery of the Aircraft on May 3, 2004.  UTF's real motivation, Austrian asserts, was to avoid paying $32 million for an aircraft that had only one-third that value.  Austrian seeks damages arising from this alleged breach of contract as well as reasonable attorneys' fees and costs pursuant to Section 10.4 of the APA.

---

[85]     PX 119.  The TCDS was updated to document this approval on March 10, 2005.  *See* PX 121, at page 63 of 63, Note 10.

[86]     That lease yielded $8,803,465 for Austrian.  *See* PX 216 (Stoeger) ¶ 13-14.

[87]     *Id.* ¶ 13, 15.

UTF contends that it never waived any of the contract's provisions. Nor did it breach the APA because the Aircraft did not comply with the delivery conditions. It seeks reasonable attorneys' fees and costs.

*Discussion*

I.  *Legal Standard*

The APA provided that the agreement was to be "governed by and construed in accordance with the laws of the State of New York (notwithstanding the conflict of laws of the State of New York)."[88]  New York courts generally enforce choice of law provisions,[89] and the parties in any case assume the applicability of New York law here.

To establish a breach of contract claim, a plaintiff must demonstrate (1) the making of a contract, (2) plaintiff's performance, (3) defendant's breach, and (4) plaintiff's damages.[90] Moreover, Article 2 of the New York Uniform Commercial Code (the "UCC") governs the contract because the APA involved the sale of a good between merchants.[91]

---

[88]

PX 23 § 10.1.

[89]

*RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003).

[90]

*E.g.*, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 146 (S.D.N.Y. 2004).  The parties do not contest the first element.

[91]

*See Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996) (applying Article 2 to an exclusive dealership contract involving rights to sell aircraft).

*II.     Did Austrian Tender a Conforming Aircraft by March 31?*

Austrian concedes, consistent with overwhelming evidence, that the Aircraft did not comply with the delivery conditions in many material respects as of March 31, 2004.[92] This typically would dispose of the matter because New York recognizes the "perfect tender" rule.[93] Austrian contends, however, that UTF waived its right to enforce the APA's March 31 delivery deadline.

As an initial matter, Austrian does not assert that the parties changed the delivery deadline in writing, as the APA would have required.[94] Rather, it contends that UTF waived the delivery deadline through its statements and conduct.[95] For conduct to amount to waiver, however, "it 'must not otherwise be compatible with the agreement as written[.]' [R]ather, 'the conduct of the parties [must] evidence[] an indisputable mutual departure from the written agreement.'"[96]

Austrian points principally to four pieces of evidence to support its contention that UTF waived its right to enforce timely delivery.

First, it argues that Ferris expressed UTF's willingness to extend the March 31

---

[92]

   *See* Tr. (Kotzian) at 94:6-96:12; Tr. (Whelan) at 134:23-136:14, 138:13-139:3.

[93]

   *See* UCC § 2-601(a) ("[I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may . . . reject the whole"); *see Fashionwear (PVT) Ltd. v. Regatta (U.S.A.) LLC*, No. 03 Civ. 5597 (JFK), 2006 WL 695256, at *3 (S.D.N.Y. Mar. 17, 2006).

[94]

   *See* PX 23 § 11.9 ("The provisions of this Agreement may only be amended or modified by a writing executed by Buyer and Seller.").

[95]

   *See* UCC § 2-209(4) (recognizing that a party may waive a contractual provision notwithstanding a provision requiring all modifications to be in writing). Such a waiver occurs "where the parties have waived time as an essential element of the contract." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 3d 246, 269-70 (S.D.N.Y. 2002).

[96]

   *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (quoting *Rose v. Spa Realty Assocs.*, 397 N.Y.S.2d 922, 927 (1977)).

delivery deadline in an email to Austrian on March 11, in which he stated

> "Assuming there are no maintenance items resulting from the test flight, March 19 is the earliest projected date that the aircraft could be ready. [UTF] would be willing to consider a delivery date that is at least 15 days after the aircraft and records are ready. If this delivery date is beyond March 31, 2004, we must agree on financial compensation for the time delay that our inspection period extends beyond March 31. Our consent to this delay shall not be taken as our willingness to consider any further delay."[97]

Ferris's statement, however, was entirely conditional – UTF's willingness to accept a delay was contingent on an agreement for financial compensation. No such agreement ever was reached. In fact, Austrian rejected Ferris's suggestion and "renew[ed its] notice that the Aircraft [would] be ready for delivery March 25, 2004."[98] These communications therefore do not evidence an "indisputable mutual departure" from the APA.

Austrian argues next that UTF exchanged status lists with Austrian on multiple occasions in April and retained its inspection team beyond the delivery deadline.[99] This conduct, however, is not necessarily incompatible with the APA. It is equally plausible that UTF considered Austrian to have breached the agreement but nonetheless decided to continue the work with a view toward the settlement negotiations that occurred at the end of the month.[100]

---

[97] PX 69, at AUA20327.

[98] PX 72, at AUA00588.

[99] *See* PX 98, at PACE006538.

[100] Austrian cites Ferris's deposition transcript as evidence that Ferris did not believe the work in April was partaken for purposes of settlement. *See* Pl. Trial Br. at 14 n.11 (citing PX 201 (Ferris Dep.) at 471:7-472:3). It is not clear how this portion of Ferris's deposition supports the proposition for which it is cited. The Court finds only that Ferris told his personnel at Lemwerder to continue to work with Austrian to try to effectuate delivery without offering a reason as to why.

Austrian further asserts that UTF had not commenced marketing the Aircraft at the time of the delivery deadline, thereby indicating that timely delivery was not essential.[101] Austrian, however, introduced an exhibit at trial showing that UTF received no fewer than 12 inquiries regarding sale and lease opportunities for the Aircraft,[102] inquiries that only could have been made in response to UTF's marketing efforts. The Court therefore rejects Austrian's contention.

Finally, Austrian contends that Jeff Lynn, UTF's vice president of aircraft remarketing, admitted during his deposition that time was not an essential element of the contract, quoting the following excerpt from the transcript:

> "Q.     Okay. Well, if there was no lessee lined up for the aircraft and no purchaser identified for the aircraft, and if, in fact, the aircraft was going to be parked in Victorville, was time of the essence?
>
> "A.     No."[103]

Austrian's reliance on this excerpt, however, is highly misleading.

As an initial matter, the Court is not persuaded that Lynn actually uttered the word "No." As will appear, an attorney at that point said "Note my objection," and it appears to the Court, based on viewing the video of the deposition, that the reporter erred in transcription.[104]

But there is no need to rely on this view because Austrian has lifted this exchange, assuming it occurred, entirely out of context. The full passage of the transcript reads:

---

[101]     Pl. Trial Br. at 12.

[102]     PX Demo. 353.

[103]     PX 202 (Lynn Dep.) at 257:10-15.

[104]     *Id.* at 257:16; *see* Court Ex. A.

"Q.     Okay. Well, if there was no lessee lined up for the aircraft and no purchaser identified for the aircraft, and if, in fact, the aircraft was going to be parked in Victorville, was time of the essence?

"A.     No.

"MR. TORIELLO:     Note my objection.

"A.     That's not the point. The point is it was in the contract. I mean, it was put into the contract in 1996. You can't forecast the contingency you just described that happened in 2004. We're not smart enough to know that in '96."[105]

Thus, Austrian omitted Lynn's insistence that the contract made time of the essence as a matter of law regardless of whether in 2004 strict compliance was of practical importance to UTF.

In sum, the contract provided that time was of the essence. Austrian failed to prove that UTF waived its right to enforce timely delivery. Accordingly, Austrian breached the contract when it failed to tender the Aircraft in conformity with the delivery conditions by March 31, 2004. In consequence, Austrian cannot succeed on its breach of contract claim. But the result would be the same even if UTF had waived its right to timely delivery.

III.     *The Status of the Aircraft on May 3, 2004*

Austrian contends that the Aircraft conformed in all material respects to the delivery conditions as of May 3, 2004,[106] and that UTF acted in bad faith when it rejected delivery. But UTF

---

[105]     PX 202 (Lynn Dep.) at 257:10-22; Court Ex. A.

[106]     Austrian contends, and UTF does not dispute, that it had a reasonable period of time in which to deliver the Aircraft, assuming that UTF waived the March 31 delivery deadline, and that delivery by May 3 fell within that period. *Schenectady Steel Co., Inc. v. Bruno Trimpoli Gen. Const. Co., Inc.*, 34 N.Y.2d 939, 940-41 (1974), *aff'g Schenectady Steel Co., Inc. v. Bruno Trimpoli Gen. Const. Co., Inc.*, 43 A.D.2d 234, 237 (3d Dept. 1974); *Doubleday & Co, Inc. v. Curtis*, 763 F.2d 495, 502 n.9 (2d Cir. 1985).

maintains that the Aircraft (1) did not satisfy the delivery conditions specified in Section (1)(iii) of Exhibit D and (2) was not accompanied by an applicable AFM, even by May 3, 2004.

### A.    *Certificate of Airworthiness*

Section (1)(iii) required in part that Austrian deliver the Aircraft "in the condition required to be . . . fully eligible to receive a . . . FAA . . . Certificate of Airworthiness."[107]   UTF maintains that the Aircraft did not satisfy this condition, even as of May 3, 2004, because it had the ACTs, which were not included in the TC for the Airbus model A310-325 and had not otherwise been approved by the FAA.   Austrian responds by claiming (1) the FAA approved the ACTs prior to the delivery deadline, whatever it was, and, in any event, (2) the APA required only that the aircraft be delivered "in a physical condition that would enable the aircraft ***to be eligible*** for a certificate of airworthiness in the United States,"[107] not that any regulatory requirements actually be satisfied.

As an initial matter, Austrian has not established that the ACTs had received FAA approval.[108]  Austrian's argument that these had been FAA approved rests on anecdotal reports that a small number of other aircraft registered and operating in the United States had ACTs, a premise from which Austrian would have the Court infer that the FAA approved not only the ACTs on those aircraft, but the ACTs on the Aircraft at issue here.   But the anecdotal reports, even if credible, are

---

[107]      PX 23 Ex. D § (1)(iii).

[107]      Pl. Trial Br. at 26 (emphasis in original).

[108]      PX 107; PX 109; Tr. (Whelan) at 134:23-136:9.

so sketchy that they leave the Court unpersuaded that there were ACTs identical or even similar to those on this Aircraft on comparable aircraft. And even if there were, it is entirely possible that those other aircraft did not comply in all respects with relevant FAA rules and procedures. In short, the anecdotal evidence, if it established anything at all, would be entirely consistent with the view that any other such aircraft "slipped in mistakenly."[109] Indeed, when Airbus finally did apply in October 2004 for approval of the ACTs, the FAA reacted in a manner inconsistent with Austrian's contention that the agency previously had approved them.

Austrian's contention that the Aircraft was in "a physical condition that would enable the aircraft to be eligible" for an FAA certificate of airworthiness depends on its contention that Section (1)(iii) bore only on the *physical* condition of the Aircraft, not its regulatory status, and that its physical condition made it eligible for such a certificate. But the argument is unpersuasive.

As an initial matter, it bears noting that the word "physical" upon which Austrian relies so heavily does not appear in Section (1)(iii). It has been injected into the discussion by its counsel's inaccurate paraphrase of the contract. But Austrian's argument would lack merit even if the word "physical" actually were in Section (1)(iii).

The physical condition of the Aircraft, in relevant part, was that it was equipped with ACTs. The presence of the ACTs resulted in the Aircraft's failure to conform to the TC for the Airbus A310-325. This failure thus resulted in the Aircraft being in a physical condition that made it *in*eligible for the issuance of an FAA certificate of airworthiness.

Austrian is well aware of this. The record amply demonstrates that it consistently

---

[109] *See* PX 206 (Backman Dep.) at 45:20-46:4.

recognized prior to March 2004 that it was required to obtain approval for the ACTs in order to comply with the APA. Indeed, the evidence demonstrates Austrian's attempts to have Airbus obtain such approval from the FAA in August 2003 and again in February 2004.[110] It developed its current position only after realizing that it would not be able to obtain that approval prior to the delivery deadline.

In sum, the Court finds that the Aircraft was not in compliance with Section (1)(iii) of Exhibit D on May 3, 2004.

B.    *FAR Part 121 180 Minute ETOPS*

Section (1)(iii) of Exhibit D mandated also that the Aircraft "be in the condition required to be . . . fully eligible to be promptly registered and operated as a FAR Part 119 or 121 (and DGAC equivalent) 180 minute ETOPS for scheduled airlines, under the laws, rules and regulations of the . . . FAA." Austrian contends that it was obliged neither to satisfy the requirements of FAR part 121 nor to obtain the FAA approval necessary for the Aircraft to be used in 180 minute ETOPS flights. It asserts in the alternative that the A310-325 had been approved for use in such operations. Neither of these contentions has any merit.

Austrian's current position regarding FAR part 121 compliance and ETOPS approval, much like its position regarding the ACTs, is belied by the position it consistently took throughout most of the delivery process.[111] It changed that position only after it realized that it had delayed

---

[110]

    *See, e.g.*, DX KB.

[111]

    *See, e.g.*, PX 42, at AUA15241 (stating that Austrian will comply with all parts of FAR 121 save for those related to the operator of the Aircraft). Austrian recognized that the Aircraft's

obtaining the approvals for too long[112] and after learning that the FAA had refused to consider its approval application.[113] Moreover, Austrian could not reasonably have believed that it was not required to obtain the design approval for the use of the A310-325 in ETOPS flights. The approval process is a lengthy one that would have precluded the Aircraft from being "*promptly* registered and operated" as such upon delivery if it had to be undertaken after delivery.[114]

Austrian contends in the alternative that the A310-325 had been approved to engage in ETOPS flights notwithstanding the fact that the approval had not been granted through the normal procedure. Frederick Leonelli, Austrian's expert on ETOPS, contended that an Airbus A310-325 bearing manufacturer's serial number 674 ("MSN 674") and equipped with a model PW4152 engine had been approved by the FAA to engage in 180 minute ETOPS flights. The MSN 674 subsequently was serviced at an FAA-approved repair facility in 1996, during which time mechanics converted the PW4152 engine to a model PW4156A, the same engine that was on the Aircraft. Each of those repairs was documented on FAA Form 337.[115] Leonelli asserted that the MSN 674 became

---

[112] compliance with FAR 121 increased both its capabilities and value. *See, e.g.*, PX 214 (Kotzian) ¶ 16.

[113] *See* PX 42, at AUA15238 (English translation) ("The matter of the ETOPS 180-minute approval in the USA can be critical (time-critical). This matter was also begun much too late.").

[114] *See* PX 47, at AUA19471.

"Promptly" normally is understood to mean within days at the most. *See* Tr. (Komposch) at 30:14-18.

[115] The FAA certifies facilities to perform repairs on aircraft. In the event that the facility performs a major repair to an aircraft's airframe, engines, appliances, or component parts, the facility must document those repairs pursuant to 14 C.F.R. § 43.9 and the aircraft may return to service only when the facility has signed Form 337.

authorized to engage in ETOPS operations after it was returned to service because Form 337 stated that "[a]ll 180 minute ETOPS modifications have been complied with" pursuant to Airbus standards for such operations.[116]  In consequence, he concluded that *any* A310-325 with a PW4156A engine had FAA technical approval for 180-minute ETOPS flights.[117]  But this is unpersuasive.

Leonelli admitted that compliance with Airbus standards for ETOPS flights did not equate with compliance with FAA standards.[118]  Indeed, it would have been impossible for the MSN 674 to have complied with FAA standards for 180 minute ETOPS flights because no such standards existed.[119]  Moreover, it is patently absurd that Austrian actually would have believed that an aircraft that otherwise would have had to endure a rigorous evaluation by the FAA in order to be approved for use in ETOPS flights, an evaluation process that was in place to ensure that the aircraft met stringent safety standards, could avoid that process altogether simply because an FAA repair station issued a return-to-service order for a different aircraft predicated upon compliance with a different set of standards.

C.    *The Airplane Flight Manual*

Section (A)(1) of Exhibit C of the APA required that Austrian provide a current FAA-approved AFM for the Aircraft upon delivery to UTF.  Austrian contends that it provided this

---

[116]

    *See* PX 10; PX 211 (Leonelli) ¶ 14.

[117]

    *See* PX 211 (Leonelli) ¶¶ 14-15.

[118]

    *See* Tr. (Leonelli) at 176:25-178:1.

[119]

    *Id.* at 172:17-22.

documentation, notwithstanding the fact that it did not include two revisions necessary to account for the extra fuel carried in the ACTs.[120]  Austrian's own witness, however, testified that the AFM was not applicable to the Aircraft without those revisions.[121]  Thus, while Austrian may have provided an AFM current and applicable to certain versions of the A310-325, it clearly did not provide one that applied to the Aircraft.

> ### D.      UTF's Rejection of the Aircraft

The UCC provides that "[e]very contract or duty within this Act imposes an obligation of good faith in its performance or enforcement"[122] and defines "good faith" as "honesty in fact in the conduct or transaction concerned."[123]  Article 2 of the UCC provides a broader definition of good faith when the transaction involves merchants.[124]  Good faith in those circumstances "means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."[125]  This good faith requirement is incorporated into all contracts governed by

---

[120]

The two revisions ultimately were approved by the FAA in July 2004.

[121]

*See* Tr. (Whelan) at 144:10-18.

[122]

UCC § 1-203.

[123]

*Id.* § 1-201(19).

[124]

Both parties concede that they are merchants.

[125]

*Id.* § 2-103(1)(b).

Article 2.[126]

Austrian contends that one of the reasonable commercial standards of fair dealing in the aircraft trade is adherence to a custom and practice[127] of accepting aircraft "with minor nonconformities" along with financial compensation for those shortcomings. It argues that UTF ignored this custom to avoid paying $32 million for an aircraft that had a market value of approximately $12 million. In consequence, Austrian asserts that UTF acted in bad faith and therefore breached its obligation under the APA.[128] This argument is entirely without merit.

First, industry custom does not apply where the express terms of a contract mandate something different.[129] In this case, Section 2.2A, a provision unique to the APA,[130] explicitly abrogated the alleged industry custom. It provided that UTF "*may* accept the Aircraft" in the event of noncompliance and further stated that Austrian "hereby confirms and agrees that it is obligated to deliver the Aircraft . . . in accordance with *all of the delivery conditions* contained in this Agreement and that [UTF] has *no obligation to purchase the Aircraft in the event such delivery*

---

[126]

     *See id.* § 1-203 (Official Comment) (noting that "under the [Article 2] definition of good faith (§ 2-103), contracts made by a merchant have incorporated in them the explicit standard not only of honesty in fact (§ 1-201), but also of observance by the merchant of reasonable commercial standards of fair dealing in the trade.").

[127]

     The UCC defines industry custom or usage of trade as "any practice or method of dealing having such regularity of observance in a . . . trade as to justify an expectation that it will be observed with respect to the transaction in question." UCC § 1-205(2).

[128]

     *See, e.g.*, *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992).

[129]

     UCC § 2-208(2).

[130]

     *See* Tr. (Komposch) at 79:14-82:2.

*conditions are not met.*"[131]  The parties therefore agreed that UTF could reject the Aircraft if Austrian failed to satisfy the delivery conditions in any way, no matter how insignificant.

Second, Austrian's argument, even if one were to put the APA aside and assume the existence of the alleged custom, would rest on misconceptions.  It describes the industry custom as imposing on a purchaser an obligation to accept an aircraft that has minor nonconformities,[132] defined as deviations from delivery conditions having no effect on the Aircraft's airworthiness or safety,[133] in exchange for some quantum of financial consideration.  The evidence, however, proves that the two unapproved ACTs affected the Aircraft's airworthiness.  Indeed, the Aircraft could not have received an FAA certificate of airworthiness until the ACTs were approved.  The Court cannot imagine stronger proof that the deviations were not minor.

Finally, Austrian failed to prove that UTF acted in bad faith when it rejected the Aircraft.  The keystone of Austrian's argument is an employee evaluation of Ferris that (1) said that his objective was to "[r]educe the exposure of the Austrian A310-300 by 1MM by 2004" and (2) concluded that he had "demonstrated extreme deftness in thwarting the airline's attempts to meet the

---

[131]

PX 23 § 2.2A (emphasis added).

[132]

*See* PX 214 (Kotzian) ¶ 19 ("[I]t is custom and practice in the aircraft industry for a buyer to accept aircraft with minor nonconformities and for the seller to provide monetary compensation for any nonconformities."); PX 212 (Komposch) ¶ 7 ("Because aircraft are such massive and complex pieces of machinery, there are inevitably certain minor deviations in specific delivery conditions that are addressed during the delivery process and resolved, through financial compensation or otherwise, not through rejection of the aircraft.").

[133]

Tr. (Komposch) at 82:9-23; *see also id.* 87:2-21 (providing the Court's explanation of Komposch's answer).

contractual delivery conditions."[134]  On this basis, it would have the Court find that UTF rejected the Aircraft not because of the deficiencies of the tender, but to avoid what otherwise had become a disadvantageous bargain.  It then relies upon *Joc Oil USA, Inc. v. Consolidated Edison Co. of New York*[135] for the proposition that such a motive would constitute bad faith and place the buyer in breach of the contract.

As a factual matter, the Court is unprepared to go as far as Austrian.  The Court assumes that UTF, quite understandably, was motivated by the decline in market value to insist upon getting everything it bargained for and, if Austrian was unable to deliver in conformity with the contract, to walk away.  It is common sense to recognize, for example, that the Aircraft would have been less valuable to UTF if, as was the case, it were ineligible to receive an FAA certificate of airworthiness than if it had conformed to the contract for the simple reason that the universe of potential purchasers or lessors would have been considerably smaller.  Thus, insistence upon the benefit of its bargain was entirely reasonable behavior.  But even if UTF was actively seeking to take advantage of Austrian's failure to tender in conformity with the APA for the dominant purpose of getting out of the deal in light of the change in the market, *Joc Oil* does not support Austrian's argument as a matter of law.

---

[134]

PX 27, at UT019878.

In fact, there is no persuasive evidence that Ferris or anyone else at UTF did anything to prevent Austrian from meeting the delivery conditions.  What Ferris did do was to ensure that UTF would not accept delivery absent full compliance with all delivery conditions.

The Court does not credit UTF's argument that the writer of the evaluation meant to include the word "not" before the phrase "to meet the contractual delivery conditions."

[135]

434 N.Y.S.2d 623 (Sup. Ct. N.Y. Co. 1980), *aff'd sub nom. T.W. Oil, Inc. v. Consol. Edison Co. of New York, Inc.,* 84 A.D.2d 970 (1st Dept. 1981) (table), *aff'd* 57 N.Y.2d 574 (1982).

*Joc Oil* involved a contract for sale of a cargo of fuel oil described as having a maximum sulphur content of 0.5 percent.  At the time, the buyer was purchasing from others fuel with sulphur exceeding 1 percent, mixing that fuel with other cargoes, and using fuel with average sulphur content of 0.6 to 0.8 percent.  When the cargo arrived, it proved to contain 0.92 percent sulpher, and the buyer rejected on that ground.  The seller promptly offered to cure the defect by substituting a conforming cargo due to arrive one week later.  The buyer rejected that offer, indicating that it would purchase that substitute cargo only at the then-prevailing market price.  The critical questions in the case, so far as is relevant here, were whether the seller had the right to cure its improper tender by offering a substitute conforming shipment and, if so, whether it did so reasonably and seasonably.

The court began its analysis with Section 2-508(2) of the Uniform Commercial Code, which provides that "[w]here the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender."[136]  The court first concluded that the seller (1) had reasonable grounds to believe that a substitute tender would be acceptable, and (2) gave timely and reasonable notice of its intention to cure.  It then noted that the substitute shipment was provided within a reasonable time, which was the relevant standard given "the absence of any contract provision or other evidence rendering time of the essence as to the original delivery."[137]  Accordingly, it held that the seller had a right to cure,

---

[136]

UCC § 2-508(2).

[137]

434 N.Y.S.2d at 630.

that it had done so properly, and that the buyer's rejection in those circumstances placed it in breach.

In the course of discussing the question whether the seller had reason to believe that a substitute tender would be acceptable, the court focused on a variety of circumstances including the buyer's indication that it would purchase the substitute cargo, but only at the then-prevailing market price.[138]  It concluded from that fact that the dispute centered more on price than on the sulphur content of the fuel and that "[t]here can be no doubt that this dispute would not exist if the market had risen at the time."[139]

Contrary to Austrian's suggestion, the *Joc Oil* court's remarks do not hold that a buyer acts in bad faith and thus breaches when it rejects a non-conforming tender because the market for the resale of the goods has declined.  Rather, the issue to which the comments were addressed was whether the seller had reasonable ground to believe that the buyer would accept a non-conforming tender and thus fall within UCC Section 2-508(2) and its policy of protecting sellers against surprise rejections.  Evidence that a buyer would have accepted a non-conforming tender at a lower price is relevant to that question.  But that is not the issue here.

In this case, as we have seen, Section 2.2A of the APA made abundantly clear that UTF would have no obligation to accept a non-conforming tender.  Thus, Austrian contracted away any right it otherwise might have had to cure its failure to perform by March 31, 2004.  The fact that UTF was prepared to discuss an extension of the delivery date in exchange for financial consideration, an offer that Austrian rejected, thus is immaterial.  And in any case, Austrian never

---

[138]

       *Id.*

[139]

       *Id.*

made a conforming tender.

Nor would the rule for which Austrian argues make much commercial sense. Where a buyer pursuant to a contract calling for future delivery is presented with non-conforming goods, price movements intervening between the agreement and the time for delivery often are taken into consideration in determining whether to reject. It makes sense to consider them because non-conformities often go not to the ultimate utility of the goods, but to their value, especially resale value. Where the parties, as they did here, contract in terms that give the buyer the right to walk away from the deal in the event of a non-conforming tender, there is no reason not to give the buyer the benefit of its bargain. That is especially so in a case like this, which involves highly sophisticated and well advised commercial entities.[140]

Accordingly, Austrian's argument is without merit.

*IV.    Damages and Attorneys' Fees*

Austrian has failed to establish that UTF breached the APA by rejecting the Aircraft. In consequence, it is not entitled to recover any damages or costs of this litigation.

As the prevailing party, UTF is "entitled to recover reasonable attorneys' fees and

---

[140] Austrian's reliance on two other cases as supporting its position is misguided. *See Printing Ctr., Inc. v. Supermind Publ'g Co.*, 669 S.W.2d 779, 784 (Tex. App. 1984) (holding that "evidence of rejection of the goods *on account of a minor defect* in a falling market *would in some instances* be sufficient to support a finding that the buyer acted in bad faith when he rejected the goods") (emphasis added); *Neumiller Farms, Inc. v. Cornett*, 368 So. 2d 272, 274-75 (Ala. 1979) (finding that a buyer who rejected potatoes due to dissatisfaction with the way they chipped had done so in bad faith because the evidence demonstrated that the potatoes chipped satisfactorily).

other costs incurred" in this action.[141]

*Conclusion*

For the foregoing reasons, Austrian failed to prove that it had satisfied the conditions precedent to UTF's obligation to purchase at any relevant time. It has failed in any case to establish bad faith on the part of UTF. This lawsuit is an unmeritorious effort to shift to UTF responsibility for Austrian's failure to tender the Aircraft in conformity with the contract. Accordingly, UTF's motion for judgment of dismissal on partial findings is granted. UTF is entitled to recover its reasonable attorneys' fees and other costs incurred in defending itself in this action. It may move within 14 days to fix the amount.

SO ORDERED.

Dated:        July 18, 2008

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[141] PX 23 § 10.4. This provision is enforceable under New York law. *See, e.g.*, *Crispino v. Greenpoint Mortgage Corp.*, 769 N.Y.S.2d 553, 556 (2d Dept. 2003).